## APPEAL OF GEORGE A. GILES CO.

Docket No. 5387.   Decided July 23, 1926.

    1. Actual cash value of leases of theatre buildings in excess of rentals remaining to be paid at time of acquisition of such leases for stock determined, for invested capital and depreciation purposes, upon basis of testimony of witnesses familiar with the buildings in question and qualified by experience to testify as to their value.

    2. Additional value claimed for good will in connection with such leases denied for insufficiency of evidence.

    3. A promise by an individual of financial assistance is not an asset which a corporation may set up on its books and capitalize.

    4. A corporation issued to G., for assets owned by him absolutely, less than 50% of its stock, and issued its remaining stock to G's wife, whose only contribution was a promise " to help financially." *Held,* upon the evidence, that the issuance of the entire capital stock was within the control of G., and, therefore, sec. 331 of the Revenue Act of 1918 should be applied in valuing the assets so transferred.

*Harry F. R. Dolan, Esq.,* for the petitioner.
*W. Frank Gibbs, Esq.,* for the Commissioner.

Before GRAUPNER,[1] TRAMMELL, and PHILLIPS.

This is an appeal from the determination of a deficiency in income and profits tax for 1918 in the amount of $1,127.30. The errors

---

[1] This decision was prepared during Mr. Graupner's term of office.

alleged are that the Commissioner excluded from invested capital the value claimed for certain leaseholds and good will acquired by the taxpayer for stock, and granted special assessment under the provisions of section 328 of the Revenue Act of 1918 on the ground that the invested capital could not be determined. The correctness of the action of the Commissioner in granting special relief under section 328 is not in question here. The taxpayer alleges that the leaseholds in question had a value at the time of acquisition and that the invested capital can be determined, and claims a deduction on account of the exhaustion of the leaseholds.

FINDINGS OF FACT.

1. The taxpayer is a Massachusetts corporation organized on March 29, 1917. The authorized capital stock was $1,000,000, consisting of 5,000 shares of preferred stock and 5,000 shares of common stock, both of the par value of $100 per share. One-half of the common stock and approximately 800 shares of the preferred stock were issued to George A. Giles and the balance was issued to his wife, as hereinafter set forth.

2. On or subsequent to November 1, 1917, and prior to the beginning of the taxable year, George A. Giles assigned to the taxpayer certain leases and property, hereinafter referred to as:

1. Gorman Theatre.
2. Gardner Theatre.
3. Orpheum Theatre.
4. Princess Theatre.
5. Stoneham Theatre.

The facts and circumstances surrounding each lease were as follows:

*Gorman Theatre.*—This theatre was located at Framingham, Mass. It was a brick theatre building used solely for theatrical purposes, containing a stage, orchestra and balcony. It had 800 seats, was fully equipped, and was used for motion pictures, vaudeville and road shows. In 1917 Framingham had a population of about 14,000, but had a theatre-drawing population of 25,000, including the surrounding districts. It was an industrial city, the industries of which were stable and not fluctuating. This theatre, together with the Princess Theatre, hereinafter referred to, were the only theatres in the city.

The lease that was assigned to the taxpayer was originally executed November 18, 1911, for five years, with two renewal periods of two and one-half years each. The lease provided for a rental of $75 per week for the first two years; $100 per week for the next three years; $105 per week for the next two and one-half years; and $110 per

week for the last two and one-half years. At the time of the assignment (November 1, 1917) the lease had approximately four years to run. The lease also contained an option to buy at $45,000 on nine months' notice. At the time of the assignment of the lease to the taxpayer, Giles was also negotiating for the purchase of the property and intended to give the taxpayer a ten-year lease. During the taxable year, however, the deed had not been consummated. Giles valued the leasehold at $30,000, basing the value on a ten-year tenure. He valued the good will at $20,000.

*Princess Theatre.*—This was a motion-picture house in Framingham, Mass. It was a metal building, built on piles, and had accommodations for 450 people. This building was conveyed by Giles to the taxpayer on November 1, 1917. Giles was then owner of the land. In 1919 the building was torn down and a new $250,000 theatre was built by Giles. This property, together with the Gorman Theatre, created a monopoly of the theatre business in Framingham.

*Gardner Theatre.*—This theatre was located in Gardner, Mass. It was a brick building, with stores on the first floor. The theatre was on the second floor and contained about 1,000 seats. It was fully equipped and was used for motion pictures, road shows and other theatrical purposes. Gardner was a town of about 15,000 people and had a theatre population of 25,000, including the outside districts. It was also a stable industrial town. On this theatre was a four-year lease dated April 17, 1915, with two renewal periods of two years each. The annual rentals for the first four years were $1,800; the next two years $2,400; and the remainder of the term $2,700. The said Giles, on November 1, 1917, transferred the lease to the taxpayer. This theatre, together with the Orpheum Theatre, hereinafter referred to, were the only theatres in the town.

*Orpheum Theatre.*—This theatre was also located in Gardner, Mass. It was a new theatre building containing 1,200 seats. It was fully equipped and was used for moving pictures and vaudeville. On this theatre was a lease dated May 24, 1912, for a term of twelve years from date of completion of the theatre building, which was May 29, 1913. The lease provided for an annual rental of 10 per cent of the cost of the building, amounting to $6,000 or $6,050 per year. This lease was assigned to the taxpayer by the said Giles November 1, 1917.

*Stoneham Theatre.*—This theatre was located in Stoneham, Mass. It was fully equipped as a moving-picture theatre and had a seating capacity of 700 to 800. Stoneham was a small town and was not regarded as a good theatre town, as it was the centre of a farming district. It had but one theatre, although there was a hall that could be converted into a moving-picture house. On May 1, 1918, the taxpayer acquired a lease on this theatre by assignment from

one Ralph Pratt, in consideration of the issuance of $22,000 par value of stock. The lease was dated November 1, 1917, and was for a term of five years, with two renewal periods of five years each. The annual rentals were as follows:

| | |
|---|---:|
| Nov. 1, 1917 to Nov. 1, 1918 | $3,000 |
| Nov. 1, 1918 to Nov. 1, 1919 | 3,200 |
| Nov. 1, 1919 to Nov. 1, 1920 | 3,300 |
| Nov. 1, 1920 to Nov. 1, 1921 | 3,400 |
| Nov. 1, 1921 to Nov. 1, 1927 | 3,500 |
| Nov. 1, 1927 to Nov. 1, 1932 | 4,000 |

3. No amounts in excess of the stipulated rentals were paid for any of the leaseholds, either by the said Giles or by the taxpayer, except in the case of the Stoneham Theatre. Upon the assignment of the leases to the taxpayer on November 1, 1917, the taxpayer issued to Giles $250,000 par value of the common stock and $80,000 of the preferred stock. Mrs. Giles, his wife, was issued a like amount of common stock and approximately $120,000 par value preferred stock. She did not pay cash. Her entire contribution was "her willingness and promise, which she carried out, to help financially."

4. In its petition the taxpayer claimed, as part of its invested capital for 1918, $132,582.24, and a deduction on account of exhaustion of $14,120.89 with respect to these leaseholds, as follows:

| | Value of lease | Exhaustion |
|---|---:|---:|
| Gorman Theatre | $29,568.35 | $2,589.93 |
| Gardner Theatre | 38,961.04 | 6,233.76 |
| Orpheum Theatre | 49,285.72 | 4,285.71 |
| Stoneham Theatre | 14,767.13 | 1,011.49 |
| | 132,582.24 | 14,120.89 |

The leases on the theatres had the following actual cash values in excess of the rentals to be paid at the time they were acquired for stock, which values represent cost for the purpose of the deductions allowed by statute on account of the exhaustion thereof:

| | |
|---|---:|
| Gorman Theatre | $30,000 |
| Gardner Theatre | 30,000 |
| Orpheum Theatre | 20,000 |
| Stoneham Theatre | 14,000 |

In its return for the year 1918, the taxpayer did not claim a deduction for exhaustion of the leaseholds. The Commissioner refused to allow any value for the leaseholds and good will and, being unable to determine the invested capital, assessed the tax under section 328 of the Revenue Act of 1918, which resulted in the deficiency in question.

## OPINION.

TRAMMELL: In this appeal the taxpayer contends that the lease-holds and good will of the theatres in question, acquired by it for stock, had an actual cash value in excess of the rentals stipulated to be paid, that such value should be included in invested capital, and that it is entitled to a deduction on account of the exhaustion of said leases.

We think that the contention of the taxpayer is supported by the evidence. The testimony of the principal witness for the taxpayer was corroborated by other witnesses, the qualifications of whom are such that we are disposed to attach much weight to their testimony.

In the first place, the witness George A. Giles, president and manager of the taxpayer, had long been identified with theatre projects, including the buying and selling of leaseholds. He had been in the real estate business for twenty-five years, dealing in apartment houses, dwellings, hotels and theatres, the last twelve years being almost exclusively devoted to the theatre business in and about Boston, Framingham, Gardner and Waltham, Mass.

The witness Richard M. Drown was secretary of the Allied Theatres of Massachusetts. For the last sixteen years he had been in the theatre business, owning, buying, selling, leasing, operating and managing theatres in the New England States. He was personally familiar with the theatres in question in November, 1917, and also knew the character of the populations and the nature or rather lack of competition and the general theatrical situation in Framingham and Gardner.

The witness Harry F. Campbell was for eleven years the New England district manager for the Fox Film Corporation and in charge of selling pictures under contract to New England cities and towns. He had been in the theatrical business for twenty-five years, the last eighteen years of which was exclusively in motion pictures. For over sixteen years he had been buying and selling, leasing and operating theatres for himself and others in New England, some of which were within a few miles of the town of Framingham. In the course of his business he was familiar with the theatres in question and the theatrical situation in Framingham and Gardner in November, 1917.

The witness Joseph Lawren dealt exclusively in theatre real estate in and about the New England States. In 1919 he went to New York and thereafter dealt solely in theatre real estate. In New England alone he consummated thirty-five to forty transactions involving theatre real estate. He was also employed by the Famous Players to investigate and report on theatres, and had made a special study and collected vast data on theatrical conditions. In the course of his busi-

ness he had occasion to make a special study of the theatres situated in Framingham and Gardner for clients. He was familiar with the Stoneham Theatre and the theatrical situation there.

Based on the testimony of such witnesses, and from a consideration of all the evidence, we are convinced that the leases had a value in excess of the stipulated rentals in the amounts as set forth in our findings of fact. As to the so-called good will acquired we attribute no value. The evidence as to the good will was hazy, meagre and entirely insufficient to base a value over and above the factors included in leasehold values.

The question now presents itself as to whether section 331 of the Revenue Act of 1918 prevents the inclusion in invested capital of the taxpayer of the cash value of the leases which we have set out in our findings of fact. Section 331 is as follows:

> In the case of the reorganization, consolidation, or change of ownership of a trade or business, or change of ownership of property, after March 3, 1917, if an interest or control in such trade or business or property of 50 per centum or more remains in the same persons, or any of them, then no asset transferred or received from the previous owner shall, for the purpose of determining invested capital, be allowed a greater value than would have been allowed under this title in computing the invested capital of such previous owner if such asset had not been so transferred or received: *Provided,* That if such previous owner was not a corporation, then the value of any asset so transferred or received shall be taken at its cost of acquisition (at the date when acquired by such previous owner) with proper allowance for depreciation, impairment, betterment or development, but no addition to the original cost shall be made for any charge or expenditure deducted as expense or otherwise on or after March 1, 1913, in computing the net income of such previous owner for purposes of taxation.

After the transfer of the assets to the corporation, Giles received less than 50 per cent of the stock issued therefor and his wife received the balance of the stock. This would appear on its face to be a case which does not come within the scope of section 331, but it requires further analysis. Giles was the owner of the leases for which the corporation issued its stock to him and his wife. His wife did not own any of the leases and had no interest therein. Her entire contribution to the corporation was her willingness and promise to help financially. Nothing was contributed by Mrs. Giles at the time the stock was issued to her. The fact that she was willing to contribute and to assist financially was not such an asset as the corporation could set up on its books and capitalize.

Our conclusion from the evidence is that the entire capital stock which was issued for the leases owned by Giles was under his control and was issued to his wife at his direction. The transaction, in substance, amounted to Giles having some of his own stock issued to his wife instead of having it issued to himself; he had the right to say to whom it should be issued by virtue of his transferring the leases to

the corporation. The ownership of the stock existed and was in Giles, who transferred assets for it before the certificate by which it was evidenced was issued.

Reaching the conclusion that Giles, who owned the assets which were exchanged for the stock, actually had control of the issuance of all the stock, we conclude that a situation is presented which brings the case within the scope of section 331 of the Revenue Act of 1918. The fact that the case comes within the scope of section 331, however, applies only to the invested capital feature and has no relation to the valuation of the leases for the purpose of deductions on account of the exhaustion thereof.

The taxpayer is entitled to take a pro rata proportion of the cost of the respective leases as a deduction in its income tax returns for the year in question. It is the cost of the leases which the taxpayer is entitled to have returned by deductions on account of the exhaustion thereof. In the absence of any other evidence in respect to the cost of such leases, the value of the leases which were paid in for stock represents the cost thereof to the corporation.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*