GOULD-MERSEREAU CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18207.  Promulgated January 22, 1931.

*Ernest G. Metcalfe, Esq.*, and *Louis W. McKernan, Esq.*, for the petitioner.

*L. A. Luce, Esq.*, for the respondent.

OPINION.

PHILLIPS: We will discuss the errors in the order in which they are numbered in our opening statement.

(1) There is no merit in petitioner's first contention in so far as it alone is concerned. In February, 1926, and within five years from the date of filing of its return for 1920 and within four years from the filing of its return for 1921, petitioner and respondent consented in writing to extend to December 31, 1926, the time within which the taxes for these years might be assessed. Before the expiration of that period respondent mailed his deficiency notice, and within sixty days thereafter petitioner filed its petition with the Board. It is clear that any deficiency due from the petitioner is not barred from assessment or collection.

In its brief the petitioner urges for the first time that the total tax must be apportioned between the affiliated corporations upon the basis of the net income assignable to each. Section 240, Revenue Acts of 1918 and 1921. On this basis it is urged that the amount which may be asserted against petitioner is smaller than that determined. Whether such a claim would be well founded would depend upon whether or not there was any agreement between petitioner and the Drapery Co. as to the apportionment of the tax computed upon the consolidated income. Had the issue been raised by an assignment of error in the petition, as required by our rules of practice, we might have hoped for some evidence as to whether or not there was such an agreement between the corporations as to the proportion which each should bear. That separate returns were originally filed would, perhaps, indicate the absence of any such agreements. The record, however, indicates that after the first ruling was made holding these corporations to be affiliated, conferences with the Bureau were held. During the progress of these there may or may not have been some agreement reached as to the corporation against which any deficiency should be assessed. No purpose would be served by attempting to speculate upon this possibility, since the issue has not been pleaded or tried. The reasonableness of the rule that all errors relied upon must be set out so as to permit the parties an opportunity to produce their evidence is not open to question. The present case presents a good example of the possible results of a failure to raise issues so as to permit a proper defense. At the conclusion of the hearing counsel for petitioner moved to amend the petition to raise the issue of the statute of limitations, being of the opinion that the record established that the collection of the taxes involved was barred. The amendment was permitted and the case reopened to try that issue. The respondent defended by producing agreements extending the period for assessment, of which agreements counsel for

petitioner apparently had no knowledge and which the respondent had no occasion to produce until the issue was raised by the pleadings. Because the pleadings do not raise the issue as to a division of the tax between the affiliated corporations, the parties have had no opportunity to produce their proofs and manifestly we should not pass upon it. The Board will not disturb the action of the Commissioner in asserting the entire deficiency against the petitioner; nor will it question his action in crediting against the tax on the consolidated income the amount of tax paid by the Drapery Co.

(2) It is alleged that the Commissioner erroneously reduced invested capital for 1920 on account of outstanding assessments of taxes for 1917 and 1918, collection of which is barred by the statute of limitations. That collection is barred is clear. *New York & Albany Lighterage Co.* v. *Bowers*, 273 U. S. 346; *Russell* v. *United States*, 278 U. S. 181. While the Board has held that invested capital is to be reduced for taxes of prior years, it has also held that alleged additional taxes for previous years, barred from collection, may not be used to reduce invested capital. *Lancaster Lens Co.*, 10 B. T. A. 1153; *National Products Co.*, 11 B. T. A. 511; *Green River Distilling Co.*, 16 B. T. A. 395; *Murtha & Schmohl Co.*, 17 B. T. A. 442; *Electric Appliance Co.*, 19 B. T. A. 707. See also I. T. 1261, C. B. I–1, p. 370.

(3) The petitioner alleges several errors on the part of the Commissioner in computing depreciation. The record is insufficient to permit us to make any substantive findings which would aid the parties, for the petitioner attempts to raise the question largely without evidence. It is first urged that the depreciation allowed the Drapery Co. was insufficient. In support of this petitioner introduced in evidence a report made by a revenue agent who computed depreciation at the amount which petitioner urges is correct. In this report the agent took the book value of machinery and equipment at 1919, added $76,699.43 as " depreciation charged off direct," deducted an amount of $9,998.16 for tools discarded in 1917, and allowed 10 per cent of the resulting figure. The report was not accepted by the Commissioner, who reduced the base and allowed 10 per cent thereof. With respect to this adjustment the computation furnished by the Commissioner to the petitioner, and submitted in evidence by the latter, states:

(a) According to agreement in conference May 28, 1925, an adjustment was made reducing machinery and equipment account by the cost of tools, etc., worn out and discarded in prior years but not written off the books. This adjustment reduces the amount subject to depreciation in 1920. Depreciation is computed at the annual rate of 10% and assets more than 10 years old are deemed to have been fully depreciated prior to the taxable year.

There is a presumption that the action of the Commissioner is correct. *Botany Worsted Mills* v. *United States*, 278 U. S. 282. This

presumption attaches to the final determination made by him and is not overcome by submitting a report of a revenue agent which he refused to follow. Since the record is devoid of any other evidence, the action of the Commissioner is sustained.

The other errors assigned with respect to depreciation arise out of the action of the Commissioner in eliminating from the machinery and equipment account all of such items as were more than 10 years old, on the theory that such assets had a life of 10 years and at the end of such period were worn out and discarded. Since the parties appear to be in agreement that 10 per cent is a reasonable rate of depreciation, the assumption of the Commissioner that such assets have a life of 10 years seems reasonable. However that may be, there is a total absence of any evidence to establish that any of such assets survived the taxable year, and on that ground alone it would be necessary to affirm the action of the Commissioner. Furthermore, it appears from evidence introduced by the petitioner and not contradicted, that these adjustments were made according to an agreement between the parties, that they benefited the Drapery Co. and the petitioner in the computation of taxes for prior years, particularly 1919, and must necessarily have been arrived at upon the basis of some evidence submitted to the Commissioner other than the revenue agent's report upon which petitioner largely relies.

(4) Respondent has disallowed the amounts of $2,450 and $3,000 paid by petitioner in 1920 and 1921, respectively, to its preferred stockholders, who were also its officers and employees, on the ground that these payments represented dividends and not compensation for services. Petitioner claims that they should be allowed as additional salaries or wages. Section 234 (a) (1) of the Revenue Acts of 1918 and 1921 provides for the deduction from gross income of " all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered * * *." Here the payments precisely equaled .10 and 12 per cent, respectively, on the preferred stock. They were made upon the strength of a corporate resolution making provision for such payment and apparently adopted before the stock was sold. Such a situation presents strong evidence that the payment was made because of the investment in the stock and this must be overcome by a sufficient showing that the payments were in fact made because of personal services actually rendered. See *Woodcliff Silk Mills*, 1 B. T. A. 715; *New York Theater Program Corporation*, 4 B. T. A. 431; *Twin City Tile & Marble Co.*, 6 B. T. A. 1238; affd., 32 Fed. (2d) 229; *General Water Heater Co.*, 14 B. T. A. 4; *Botany Worsted Mills* v. *United States, supra.* This

burden rests upon petitioner. Here we have no evidence whatever as to what were the duties performed by the preferred stockholders, the value of their services, or the amounts paid them. We do know that the president and principal common stockholder of the company owned 145 shares of preferred stock and received $1,450 out of the total of $2,450 paid in 1920 and $1,740 of the total payment of $3,000 in 1921. In the absence of evidence as to the amount or reasonableness of the salaries paid, we are compelled to affirm respondent on this issue.

(5) Prior to September 1, 1920, D. M. Sarkisian owned from 75 to 98 per cent of the stock of petitioner and petitioner owned all the stock of the Drapery Co. On that date Sarkisian sold to the Drapery Co. certain machinery and patents, as enumerated in the findings, and received therefor capital stock of the company. The evidence is to the effect that after the transfer Sarkisian owned 75 per cent of the stock of the Drapery Co. How he acquired 25 per cent of this does not appear, but it is certain that he owned at least 50 per cent. This brings the transaction squarely within the provisions of section 331 of the Revenue Act of 1918. The machinery and patents should be included in invested capital at their depreciated cost to Sarkisian.

Section 331 deals only with invested capital and the limitation which it imposes does not apply to depreciation, which should be computed on these assets at their cost to the Drapery Co. when they were paid in for stock. *Ben T. Wright, Inc.*, 12 B. T. A. 1149, *George A. Giles Co.*, 4 B. T. A. 335. The evidence is sufficient to establish a market value of $10,000 for the machinery, but fails to establish any substantial value for patents. The only witness on this issue is Sarkisian, who in his testimony disclosed that he had no real conception of the meaning of the term "fair market value." After the term had been explained to him and after stating that he could not value the patents separately, he placed the fair market value of them as a whole at $50,000. On further examination it appeared that this value included the amount due him for unpaid royalties and the value of one patent which he owned but did not transfer. It was also developed that this value was estimated on a royalty basis. That this valuation is excessive is shown by the fact that the highest amount actually paid to Sarkisian in one year as royalties was the sum of $2,000 and the greatest amount due in any year (but not paid) was estimated by him at $3,000, which he said included about $1,000 on the patent which was not transferred. The latest of the patents transferred had only about four years of life. All that Sarkisian could have expected in royalties for the remaining years would have been $8,500 at a most liberal estimate, for the two which he said were the most valuable of those transferred had a very short life

remaining before they expired.  In order to account for his valuation of the patents this witness testified that their use had resulted in large benefits to his corporations and then, to explain why royalties were not paid, he testified that the financial condition of the corporations did not justify their payment.  This valuation of $50,000 was the only value for the patents which was sought to be established. This amount is obviously so excessive that we must disregard it.  It would, appear, however, that these patents were in daily use and did have some market value, which we are of opinion was not less than their cost to Sarkisian, less ratable exhaustion thereof to September 1, 1930.  This should be the basis for the computation of a deduction for their subsequent exhaustion.

(6) The overcharge to McKay was a clerical error.  Petitioner being on the accrual basis, accrued this overcharge and included it in gross income in its return for 1921.  The overcharge should be excluded from gross income for that year.

(7) Respondent erred in disallowing as a deduction the dues and additional expenses paid to a trade organization.

(8) Respondent did not err in refusing to permit petitioner to deduct from its gross income in 1920 the whole of the commission paid to secure leases which ran for five years, no one of which was surrendered in either of the years before us.  This was a capital expenditure which should be prorated over the terms of the leases. This respondent has done.  *Bonwit Teller & Co.*, 17 B. T. A. 1019; *Julia Stow Lovejoy*, 18 B. T. A. 1179; *James M. Butler*, 19 B. T. A. 718.  Cf. *Duffy* v. *Central Railroad Co.*, 268 U. S. 55.

(9) Petitioner contends that a net loss for 1918 was determined after the Revenue Act of 1924 became effective and therefore should be applied in accordance with the provisions of that act and deducted from its net income for 1920.  The answer to this is, first, that the Revenue Act of 1924 does not purport to impose taxes for the years 1919 and 1920; second, that a net loss as defined in section 204 of the Revenue Act of 1918 is quite a different deduction from that defined in section 206 of the Revenue Act of 1924; and, third, that section 1400 of the Revenue Act of 1921 and section 1100 of the Revenue Act of 1924 in effect provide that the Revenue Act of 1918 shall remain in force for the collection and assessment of all taxes imposed by that act.  In this connection petitioner points out that taxes for 1918 were barred when the net loss, or at least a part of the net loss, for 1919 was determined.  Section 204 (b) of the Revenue Act of 1918 provides:

If for any taxable year beginning after October 31, 1918, and ending prior to January 1, 1920, it appears upon the production of evidence satisfactory to the Commissioner that any taxpayer has sustained a net loss, the amount of such net loss shall under regulations prescribed by the Commissioner with

the approval of the Secretary be deducted from the net income of the taxpayer for the preceding taxable year; and the taxes imposed by this title and by Title III for such preceding taxable year shall be redetermined accordingly. Any amount found to be due to the taxpayer upon the basis of such redetermination shall be credited or refunded to the taxpayer in accordance with the provisions of section 252. If such net loss is in excess of the net income for such preceding taxable year, the amount of such excess shall under regulations prescribed by the Commissioner with the approval of the Secretary be allowed as a deduction in computing the net income for the succeeding taxable year.

Under the above provision it was mandatory upon respondent to deduct the entire net loss for 1919 from the net income for 1918, unless the net loss was in excess of such net income, in which case the excess was to be used as a deduction in computing the net income for the succeeding taxable year. Here the succeeding taxable year was 1920. Since the whole of the deduction was exhausted in computing the tax for 1918, there remained nothing to be used as a deduction in 1920. The fact that the collection of the taxes for 1918 was barred by the statute of limitations does not affect this conclusion. To hold that the net loss for 1919 should not be deducted from the net income for 1918 because the tax for the latter year is barred would be to introduce into section 204 a provision not found there. Further, the tax that is barred is not a tax greater or less than the true tax, but is the tax for the year properly computed. In such computation all proper additions and deductions should be made. Respondent has properly applied the net loss for 1919.

(10) With respect to error (10) it is sufficient to point out that we have held that the Board does not possess jurisdiction to determine the year or years in which respondent should apply a credit for the overpayment of tax for a year not before it. *Dickerman & Englis, Inc.,* 5 B. T. A. 633; *Lester H. Cranston et al., Executors,* 5 B. T. A. 993; *John W. Anderson,* 12 B. T. A. 1111; *B. T. Couch Glue Co.,* 12 B. T. A. 1321. The deficiency which the Board is to redetermine is defined by statute as the difference between the proper tax and the amount previously assessed. The Board has nothing to do with respect to such administrative matters as collection, payment, or credit. We are powerless to disturb the application of the overpayment made by respondent.

(11) Respondent erred in holding that the loss incurred by the consolidated group with respect to the assets acquired from the Nana Auto Specialty Co. resulted from an intercompany transaction. It resulted from a loss of a part of the assets which had become worthless, and this irrespective of the transfer of part of the assets from

petitioner to the Drapery Co. There appears to be no dispute that the amount of the loss was properly computed by respondent, except that petitioner makes an indefinite complaint to the effect that proper depreciation has not been computed on these assets. The complaint finds no support in the records.

*Decision will be entered under Rule 50.*