Riverpoint Lace Works, Inc. v. Commissioner.
Riverpoint Lace Works, Inc. v. Commissioner
Docket No. 44929.
United States Tax Court
T.C. Memo 1954-39; 1954 Tax Ct. Memo LEXIS 208; 13 T.C.M. (CCH) 463; T.C.M. (RIA) 54143; May 13, 1954, Filed Santi J. Paul, Esq., 1711 Industrial Trust Building, Providence, R.I., and Alfred E. Motta, Esq., for the petitioner. James R. McGowan, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in income tax for 1947 in the amount of $10,809.11. The only issue for decision is whether $18,000 should be deducted in computing a net loss of the petitioner for 1949 as the basis for a net operating loss deduction for 1947 under section 23(s) and section 122. Findings of Fact The petitioner was incorporated in 1932 under the laws of Rhode Island, and has at all times been engaged in the business of manufacturing lace at 825 Main Street, West Warwick, Rhode Island, sometimes called the Lippitt Mill. Its return for the taxable year was filed with the *209 collector of internal revenue for the District of Rhode Island. The stock of the petitioner was owned in equal shares by George A. and John E. Hayes, brothers, who were also its officers and directors. The Commissioner, in determining the deficiency for 1947, made an adjustment as follows: Claimed net operating loss in 1949
$44,980.37
Unallowable deductions and
additional income - 1949
Accrued Officers' Com-
sation
$ 6,000.00
Contributions - 1949
455.00
Payroll tax adjust-
ment
36.01
Rent
18,000.00
Total unallowable deductions
and additional income -
1949
24,491.01
Net operating loss deduction - 1947
$20,489.36
The petitioner acquired its mill property in 1932 and carried the land on its books at $3,014 and the buildings at $18,000 less depreciation based on a useful life of twenty years. The petitioner spent $13,714.69 in 1947 for painting the mill and for work on its roof, stairways, and plumbing. Those expenditures were recorded on the books as repairs but the Commissioner, in determining the deficiency, disallowed $4,304.16 of the amount because it represented capital improvements. The captial account for the buildings was increased *210 in 1948 by expenditures of $20,062.14 consisting of the following: Rewiring Building
$ 4,768.90
Painting Weave Room
2,506.00
Reconstruction of Weave
Room Floor
12,787.24
Total
$20,062.14 $9,537.80 was spent in 1948 to rewire the mill partly because of deterioration of the original wire insulation, and partly because additional wiring was necessary to meet an increased workload, but one-half of the expenditure was charged to expense. An account was opened in August 1948 entitled "Construction in Process" primarily to record expenses in the reconstruction of the weave room floor. $25,574.48 was charged to that account in 1948 but on December 31, 1948, $12,787.24 was charged off to expense. Later, as a result of a revenue agent's audit of 1948, the petitioner agreed to the capitalization of $9,259.68 of the $12,787.24 charged off to expense. The cost of the land and buildings less depreciation shown on the books at the end of 1948 was $26,174.59, but should have been $35,434.27. The value of the land and buildings was far greater than the correct book cost less depreciation in January 1949. John and George Hayes, together with their wives, organized the J & G *211 Realty Corporation (hereafter called J & G) on November 17, 1948. Each of the four paid $7,500 for 25 per cent of the stock of that corporation. The two stockholders and directors of the petitioner and the directors of J & G passed resolutions at meetings held on January 26, 1949, authorizing the conveyance of the Lippitt Mill from the petitioner to J & G for $26,174.59 and the leasing of it by the petitioner at $18,000 per year. The petitioner, on January 26, 1949, conveyed the Lippitt Mill property to J & G for $26,174.59 and received payment in that amount from the latter on February 23, 1949. The petitioner did not report the sale on its return for 1949. The petitioner would not have sold the property to an unrelated buyer at that price and was not interested in a sale to any other buyer. The petitioner and J & G entered into a lease agreement dated January 26, 1949, providing for the lease of "The entire building known as the Lippitt Mill, located at 825 Main Street, West Warwick, Rhode Island" for a period of five years from the 1st of February, 1949, to the 31st of January, 1954, at a rental of $18,000 a year payable in equal monthly payments of $1,500 each on the first *212 business day of each month. The petitioner gave its check on December 29, 1949 for $18,000 to J & G and on the same day J & G loaned the petitioner $14,000 on the petitioner's demand promissory note which bore no interest. The petitioner had not repaid the $14,000 and had paid no interest on the loan up to the date of the hearing in this case. The board of directors of J & G, at a meeting on December 29, 1949, passed a resolution "that the offer of Riverpoint Lace Works, Inc. to renew the lease of the Lippitt Mill * * * under the same terms and conditions and including a monthly rental of $1,500 be and the same is hereby accepted" and authorizing the execution of the renewal of the lease for a period of one year. A resolution was also adopted at that meeting authorizing the loan of $14,000 to the petitioner on its demand note. The board of directors of J & G passed a resolution on July 15, 1950, that the terms of the lease of the Lippitt Mill property be amended to make the total rental for the year 1950 $12,000, and that the lessee pay the sum of $300 per month for the remaining months of that year. The minutes of a meeting of the directors of the petitioner on January 2, 1951, recite *213 that the lease of the Lippitt Mill property had expired on December 31, 1950, and the lessor agreed to an adjustment in rent, whereupon it was resolved that the lease executed on December 31, 1950, be renewed by the petitioner for a period of one year under the same conditions, except that the rent should be $12,000, payable in equal monthly installments of $1,000. Thereafter, the board of directors of the petitioner adopted resolutions from time to time to renew the lease for one year at the same rental. The minutes of a meeting of the board of directors of J & G dated January 18, 1951, recite that the president pointed out that the lease of the Lippitt Mill property expired on December 31, 1950, and after discussion it was resolved that a new lease be executed under the same terms and conditions as the former lease except that the annual rental would be $12,000 and the period of the lease would be for one year. The minutes of the meeting of the directors of J & G held on May 2, 1951, recite that the petitioner was seeking to borrow $50,000 from a bank and in order to obtain the loan it would be necessary for J & G to guarantee the loan, whereupon it was resolved that J & G guarantee *214 the obligation of the petitioner in the amount of $50,000 and endorse notes, mortgages or other evidence of the indebtedness. This matter was again considered at a meeting of the directors of J & G on May 28, 1951, at which it was resolved that J & G would endorse the promissory note of the petitioner to the bank in the sum of $50,000 and all extensions and renewals thereof, and would give to the bank as security for the loan a mortgage on the property of J & G. It was resolved at a meeting of the directors of J & G on January 2, 1952, to renew the lease of the Lippitt Mill property to the petitioner at the rental of $12,000 a year under the same conditions as the previous lease for a period of one year. There was a similar extension of the lease approved at a similar meeting on January 12, 1953. The petitioner on its return for 1949 included $18,000 in the deduction claimed for rent, and on its returns for 1950, 1951 and 1952 included $12,000 in the deduction claimed, all representing rent on the Lippitt Mill property. $9,000 of rent was carried as an asset by J & G at the close of 1951 and this had increased by $7,000 to $16,000 at the end of 1952. The petitioner had made no *215 payment on the $14,000 note or on the rent item of $16,000 up to the date of the hearing. The petitioner made capital expenditures on the leased property of $6,672.89 in 1949 and $6,820.21 in 1950, or a total of $13,493.10, and claimed depreciation thereon on its returns based upon a five year life. The only change in the building account of J & G after January 1949 was an increase of $1,534.34 during 1950. It deducted $1,671 in 1950, $63.63 in 1951 and $220.40 in 1952 for repairs. J & G deducted $2,400 for 1949, $6,000 for 1950 and $5,200 for 1951 as officers' salaries payable equally to the wives of John and George. They were its only employees. It also deducted as salaries and wages $425 for 1950, $1,300 for 1951 and $1,300 for 1952. The two wives were inexperienced in business and devoted little time to the affairs of J & G. The books of J & G were kept by employees of the petitioner at the office of the petitioner at no cost to J & G which had no separate office and paid no rent. All facts stipulated by the parties are incorporated herein by this reference. Opinion MURDOCK, Judge: The taxable year is 1947 and the only issue is whether a deduction of $18,000 for rent *216 for 1949 is proper in computing a net operating loss for that year for the purpose of the net operating loss deduction for 1947. No other adjustment is contested. Section 23(a)(1)(A) of the Internal Revenue Code allows a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including, inter alia, "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity." The Commissioner contends that there was no business purpose for the alleged sale and lease-back transaction of January 26, 1949, it was not entered into in good faith, was a formality only, was totally lacking in substance and should be disregarded by the Court. He concludes that the petitioner is not entitled to deduct $18,000 as rental in 1949 because the amount was not an ordinary and necessary expense of the petitioner paid or incurred during that year in carrying *217 on its trade or business and was not required to be made as a condition to the continued use or possession of a business property to which the petitioner had not taken or was not taking title and in which it had no equity, within the meaning of section 23(a)(1)(A). The transactions between the petitioner and J & G require careful scrutiny because they were family corporations which could use legal formalities to give a false appearance where substance would be lacking. Woodcliff Silk Mills, 1 B.T.A. 715; Twin City Tile & Marble Co., 6 B.T.A. 1238, affd. 32 Fed. (2d) 229; Gould-Mersereau Co., 21 B.T.A. 1316, 1325; Granberg Equipment, Inc., 11 T.C. 704, 713; Higgins v. Smith, 308 U.S. 473, 477-78. Obviously, the petitioner would be entitled to deduct rent under section 23(a)(1)(A) if it had sold its property in an arm's length transaction to a buyer having adverse interests and then had leased back the property at a fair rental. The same might have been true had it sold to J & G at a price commensurate with *218 the fair market value of the property and then had entered into a lease made up of provisions which adverse parties dealing at arm's length might have agreed to, including a reasonable rental, and particularly if the sale and lease-back had been made by the petitioner for some good business reason. However, the following circumstances, among others, tend to show that the sale and lease-back were not entered into in good faith and were mere formalities lacking in substance so far as a deduction under section 23(a)(1)(A) is concerned: 1. The parties did not observe the provisions of the lease in that: (a) It called for monthly payments of $1,500 on the first business day of each month but no such payments were made. (b) The term of the lease was to be from February 1, 1949 to January 31, 1954 but on December 29, 1949 the petitioner issued its check for $18,000 payable to J & G as if it owed rent for each of the twelve months of 1949 whereas it owned the property during the month of January 1949 and under the terms of the lease owed J & G only $16,500 at the end of December 1949. (c) J & G on December 29, 1949 returned $14,000 to the petitioner allegedly as an interest-free loan. *219 The petitioner still retained the $14,000 on December 9, 1953 when the trial in this proceeding took place. (d) The lease was "renewed" under the same terms for a period of one year at the end of 1949 although it still had four years and one month to run at that time. This "renewal" procedure was repeated at the beginning of each year thereafter. (e) The rental was reduced to $12,000 in July 1950 as of January 1, 1950 in order to make it "easier" for the petitioner. 2. The rental for 1951 was to be $12,000 but $9,000 of that amount was never paid. It was set up as an accrued liability without interest on the books of the petitioner. 3. Similarly, $7,000 of the $12,000 rent for 1952 was never paid but was set up as an accrued liability without interest on the books of the petitioner. 4. The petitioner took income tax deductions of $18,000 for 1949 and $12,000 for each of the next three years although $14,000 of the $18,000 for 1949 was transferred back to the petitioner and $9,000 for 1951 and $7,000 for 1952 was never paid, making a total "indebtedness" at the end of 1952 of $30,000, on which no interest was payable and the full amount of which remained outstanding at the *220 date of the hearing in this case. 5. J & G meanwhile claimed deductions totalling $16,625 for salaries and wages paid to the two wives which was grossly in excess of reasonable compensation for their services. 6. J & G became liable on the indebtedness and gave a mortgage on its property to secure the loan when the petitioner desired to borrow $50,000 from a bank in 1951. 7. The amount spent by the petitioner for improvements on the mill property after January 26, 1949 was many times the amount which J & G spent for that purpose. 8. The property was transferred from the petitioner to J & G at a price of $26,174.59 and was immediately leased back at an annual rental of $18,000 which was over 68 per cent of the alleged purchase price. 9. The petitioner called an experienced real estate man as a witness who expressed the opinion that as of December 1953 a reasonable rental for the property was $18,000 but there is no evidence to show what a reasonable rental was as of January 26, 1949 under a lease such as the parties entered into on that date. 10. The evidence indicates that the fair market value of the petitioner's mill property on January 26, 1949 was many times $26,174.59. *221 11. The testimony of the witnesses as to the purpose behind the transfer and leaseback is pitiful and discloses no business purpose for the action of the petitioner. Alpha Tank & Sheet Metal Mfg. Co. v. United States, 116 Fed. Supp. 721. 12. No consideration was given to the fair market value of the property or the amount which the petitioner should receive for its property if it really intended to sell it and only superficial consideration was given to the amount of the rent, terms of the lease, problems of improvements and repairs and other important items. 13. The entire arrangement was approached solely from an accounting standpoint. 14. The evidence, as a whole, indicates that the arrangement was intended to be no more binding than the parties might find convenient in the future. Some of the circumstances to which attention has been drawn above are not necessarily inconsistent with a bona fide sale and lease-back. However, when those circumstances and others are considered together, they justify the conclusion that this whole arrangement was a sham concocted by the two brothers and their wives on poor advice, for non-business purposes so far as the petitioner *222 is concerned. Cf. Ingle Coal Corporation, 10 T.C. 1199, affd. 174 Fed. (2d) 569; Granberg Equipment, Inc., supra; Catherine G. Armston, 12 T.C. 539, affd. 188 Fed. (2d) 531; Alpha Tank & Sheet Metal Mfg. Co. v. United States, supra.The petitioner has failed to show by a fair preponderance of the evidence that it incurred any necessary expense in carrying on its business during 1949 for the payment of rent, that the payment of any rental was required as a condition to the continued use or possession of the mill property or that the petitioner had no equity in that property during 1949. The Commissioner did not err in disallowing the deduction of $18,000 in computing the 1949 net operating loss for the purpose of the 1947 net operating loss deduction. The only issue submitted for decision is decided adversely for the petitioner. Decision will be entered for the respondent.